J-S75035-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| HEMANT KOHLI, | : | |
| | : | |
| Appellant | : | No. 101 EDA 2016 |

Appeal from the Judgment of Sentence entered on October 21, 2013
in the Court of Common Pleas of Chester County,
Criminal Division, No(s):  CP-15-CR-0000569-2013

BEFORE:  BOWES, MOULTON and MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, J.:          **FILED FEBRUARY 14, 2017**

Hemant Kohli ("Kohli") appeals, *nunc pro tunc*, from the judgment of sentence imposed following his conviction of driving under the influence ("DUI").  **See** 75 Pa.C.S.A. § 3802(a)(1).  We vacate the judgment of sentence and remand for resentencing.

The trial court has set forth an extensive recitation of the underlying facts in its Opinion, which we adopt for the purpose of this appeal.  **See** Trial Court Opinion, 3/10/16, at 4-19.

On August 6, 2013, following a jury trial, Kohli was found guilty of one count of DUI.  The jury also found that Kohli had refused to submit to a blood test.  On October 21, 2013, the trial court sentenced Kohli to 18 to 36

months in prison, followed by two years' probation.[1]  Kohli did not file a direct appeal.

On September 8, 2014, Kohli filed a counseled Post Conviction Relief Act ("PCRA")[2] Petition.  On December 3, 2015, with agreement of the Commonwealth, the PCRA court entered an Order granting Kohli the right to file a *nunc pro tunc* direct appeal.  Thereafter, Kohli filed a *nunc pro tunc* appeal and a Pennsylvania Rule of Appellate Procedure 1925(b) Concise Statement.

On appeal, Kohli raises the following questions for our review:

1. Whether the evidence was insufficient as a matter of law to sustain [Kohli's] conviction for [DUI]?

2. Did the Common Pleas Court [err] in imposing a minimum mandatory sentence?

Brief for Appellant at 2.

In his first claim, Kohli contends that the evidence was insufficient to support his conviction.  *Id*. at 7.  Kohli argues that he only had one drink approximately seven hours prior to the vehicle stop; when he stopped his vehicle at the stop sign, the vehicle only slightly went past the sign; he was able to pull over when the officer engaged his emergency lights; and there was no other evidence of erratic driving.  *Id*. at 8-9.  Kohli asserts that he

---

[1] At sentencing, the trial court noted that the conviction at issue in this case was Kohli's third DUI conviction in a ten-year period.  N.T., 10/21/13, at 5, 9.

[2] *See* 42 Pa.C.S.A. §§ 9541-9546.

passed the first field sobriety test and only exhibited signs of impairment on the "walk and turn test and [the] one[-]leg test." *Id*. at 9. Kohli further denies that he slurred his speech, had bloodshot eyes, admitted to drinking alcohol, or engaged in any extreme behavior. *Id*. Rather, Kohli claims that he was coherent at the time of the stop. *Id*. Kohli also contends that there was no blood alcohol or drug testing conducted to demonstrate that he was under the influence. *Id*. Kohli argues that he refused to submit to a blood test because he was battling a skin disorder and was prone to infection from a needle. *Id*. Kohli asserts that he should have been provided an alternative chemical test, and that such a test could have rebutted the Commonwealth's allegations. *Id*. at 9-10.

The trial court set forth the relevant law, addressed Kohli's sufficiency claim, and determined that it is without merit. *See* Trial Court Opinion, 3/10/16, at 2-21.[3] We adopt the trial court's sound reasoning for the purpose of this appeal. *See id*.

In his second claim, Kohli contends that his mandatory minimum sentence was illegal based upon *Alleyne v. United States*, 133 S. Ct. 2151

---

[3] We note that Kohli's claim regarding the failure to conduct blood alcohol testing does not render the evidence insufficient to support his DUI conviction under section 3802(a)(1). *See Commonwealth v. Teems*, 74 A.3d 142, 145 (Pa. Super. 2013)

(2013). Brief for Appellant at 11.[4] Kohli argues that his sentence is illegal because the jury did not find beyond a reasonable doubt all facts necessary to require imposition of a mandatory minimum sentence. *Id*.[5]

Section 3804(c)(3) states the following:

**(c) Incapacity; highest blood alcohol; controlled substances.--**An individual who violates section 3802(a)(1) and refused testing of blood or breath or an individual who violates section 3802(c) or (d) shall be sentenced as follows:

\*\*\*

(3) For a third or subsequent offense, to:

(i) undergo imprisonment of not less than one year;

(ii) pay a fine of not less than $2,500; and

(iii) comply with all drug and alcohol treatment requirements imposed under sections 3814 and 3815.

75 Pa.C.S.A. § 3804(c)(3).

Here, the mandatory minimum sentence was imposed based upon Kohli's prior convictions, his violation of section 3802(a)(1), and his failure

---

[4] Kohli's failure to include this legality claim in his Rule 1925(b) Concise Statement does not result in waiver. *See Commonwealth v. Henderson*, 938 A.2d 1063, 1065 n.1 (Pa. Super. 2007) (stating that appellant's failure to include a legality of sentence challenge in his Rule 1925(b) concise statement did not result in waiver, as such a claim cannot be waived where jurisdictional requirements are met).

[5] We note that Kohli does not identify the "fact" that the trial court utilized in imposing the mandatory minimum sentence. *See* Pa.R.A.P. 2119(a) (stating that the argument must contain "such discussion and citation of authorities as are deemed pertinent."). Here, Kohli was subject to the mandatory minimum sentence under 75 Pa.C.S.A. § 3804(c)(3). *See* N.T., 10/21/13, at 21.

to consent to a blood test. **See** N.T., 8/6/13, at 63-64. Prior to addressing Kohli's claim on appeal, we will first determine whether the imposition of the mandatory minimum sentence violated the recent United States Supreme Court holding in **Birchfield v. North Dakota**, 136 S. Ct. 2160 (2016).[6]

In **Birchfield**, the Supreme Court concluded that "a breath test, but not a blood test, may be administered as a search incident to a lawful arrest for drunk driving." **Birchfield**, 136 S. Ct. at 2185. Additionally, the Supreme Court held that blood tests taken pursuant to implied consent laws are an unconstitutional invasion of privacy. **Id**. at 2186. The Supreme Court stated that "motorists cannot be deemed to have consented to submit to a blood test on pain of committing a criminal offense." **Id**.; **see also id**. (concluding that the petitioner could not be convicted of refusing a warrantless blood draw following an arrest for driving under the influence).

As the **Birchfield** Court held that the practice of criminalizing the failure to consent to blood testing following a driving under the influence arrest was unconstitutional, the trial court improperly relied upon section 3804(c)(3) in imposing a mandatory minimum sentence upon Kohli. **See Commonwealth v. Giron**, 2017 PA Super 23, *4 (Pa. Super. 2017) (holding that "pursuant to **Birchfield**, in the absence of a warrant or exigent

---

[6] We note that sentencing issues relating to a court's statutory authority to impose a sentence implicate the legality of sentence. **Commonwealth v. Foster**, 17 A.3d 332, 342 (Pa. 2011). While this issue was not raised by the trial court, the Commonwealth, or Kohli, it is well-settled that legality of sentence questions may be raised *sua sponte* by this Court. **See Commonwealth v. Wolfe**, 106 A.3d 800, 801 (Pa. Super. 2014).

circumstances justifying a search, a defendant who refuses to provide a blood sample when requested by police is not subject to the enhanced penalties provided in 75 Pa.C.S.A. §§ 3803-3804.").  Because there was no statutory authority to impose the sentence, we must vacate the judgment of sentence and remand for resentencing.  *See id*.[7]

Judgment of sentence vacated.  Case remanded for resentencing. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/14/2017

---

[7] Based upon our disposition, we need not further address Kohli's bald *Alleyne* challenge.

COMMONWEALTH OF PENNSYLVANIA : IN THE COURT OF COMMON PLEAS

: CHESTER COUNTY, PENNSYLVANIA

VS : CRIMINAL ACTION

HEMANT KOHLI : NO. 569-13

: SUPERIOR CT. NO. 101 EDA 2016

## STATEMENT OF THE COURT

On December 30, 2015, Defendant filed a timely appeal following the court's December 3, 2015 granting of his nunc pro tunc appeal request. An appeal having been taken, pursuant to Pa.R.A.P. 1925(a), the following statement is submitted.

On August 6, 2013, a jury found Defendant guilty of driving under the influence, in violation of 75 Pa.C.S.A. § 3802(a)(1). The jury also found that Defendant refused to submit to a blood test. Defendant was sentenced on October 21, 2013.

On September 8, 2014, Defendant filed a Post Conviction Relief Act Petition. On September 17, 2014, an Order was entered directing the Commonwealth to file an Answer within 45 days. The Commonwealth filed an Answer on October 29, 2014. On March 4, 2015, an Order was entered directing Defendant to comply with 42 Pa.C.S.A. § 9545(d)(1), which requires signed certifications from each intended witness when an evidentiary hearing is requested.

After Defendant complied with the certification requirement, an Order was entered on May 27, 2015, scheduling an evidentiary hearing to be held on June 24, 2015. On June 15, 2015, Defendant's request for a continuance of the hearing was granted and the hearing was rescheduled for August 3, 2015. On July 27, 2015, Defendant's request for

a continuance of the hearing was granted and the hearing was rescheduled for September 16, 2015. On September 14, 2015, Defendant's request for a continuance of the hearing was granted and the hearing was rescheduled for October 13, 2015.

Following the evidentiary hearing, and with the agreement of the Commonwealth, an Order was entered on December 3, 2015 granting Defendant's request to file an appeal nunc pro tunc. On December 30, 2015, Defendant filed a Notice of Appeal and included a Statement of Matters Complained of on Appeal. Defendant alleges that the evidence was insufficient to support the verdict and that the verdict was against the weight of the evidence.[1] We will first address the sufficiency of the evidence claim and then address the weight of the evidence claim.

## Sufficiency of the Evidence:

The standard for reviewing the sufficiency of the evidence is "whether the evidence, viewed in the light most favorable to the Commonwealth as verdict winner, is sufficient to enable the fact-finder to find every element of the crime beyond a reasonable doubt." Commonwealth v. Matthew, 909 A.2d 1254, 1256-57 (Pa. 2006), citing Commonwealth v. Williams, 896 A.2d 523, 535 (Pa. 2006), cert. denied, 127 S.Ct. 1253 (2007), and Commonwealth v. Randolph, 873 A.2d 1277, 1281 (Pa. 2005), cert. denied, 547 U.S. 1058, 126 S.Ct. 1659 (2006).

In addition, all reasonable inferences drawn from the evidence must be viewed in the light most favorable to the Commonwealth. Commonwealth v. McCollum, 926 A.2d 527, 530 (Pa.Super. 2007), quoting Commonwealth v. Earnest, 563 A.2d 158, 159 (Pa.Super. 1989). "The test is whether the evidence, thus viewed, is sufficient to prove

---

[1] Defendant's Statement of Matters Complained of on Appeal states "the judge's verdict of guilty,"

2

guilt beyond a reasonable doubt." McCollum, 926 A.2d at 530, citing Commonwealth v. Swerdlow, 636 A.2d 1173 (Pa.Super. 1994). "'This standard is equally applicable to cases where the evidence is circumstantial rather than direct so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt.'" McCollum, 926 A.2d at 530, quoting Swerdlow, 636 A.2d at 1176.

A conviction must be based on more than mere suspicion or conjecture, however, the Commonwealth does not need to establish guilt to a mathematical certainty. McCollum, 926 A.2d at 530, quoting Commonwealth v. Badman, 580 A.2d 1367, 1372 (Pa.Super. 1990). "Moreover, the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence." Commonwealth v. Marrero, 914 A.2d 870, 872 (Pa.Super. 2006), citing Commonwealth v. Bullick, 830 A.2d 998, 1000 (Pa.Super. 2003).

The court may not weigh the evidence and substitute its judgment for the fact-finder. Id. "Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances." Marrero, 914 A.2d at 872, citing Commonwealth v. DiStefano, 782 A.2d 574, 582 (Pa.Super. 2001), app. denied, 806 A.2d 858 (Pa. 2002). When evaluating the credibility of the witnesses and evidence as well as the weight of the evidence, the fact-finder is free to believe all, part, or none of the evidence presented. Commonwealth v. Faulk, 928 A.2d 1061, 1069 (Pa.Super. 2007), app. denied, 944 A.2d 756 (Pa. 2008), quoting Commonwealth v.

---

however, the verdict of guilty was found by a jury, not the judge.

3

Stevenson, 894 A.2d 759, 773 (Pa.Super. 2006), app. denied, 917 A.2d 846 (Pa. 2007).

The uncorroborated testimony of one victim, if believed by the trier of fact, is sufficient to convict a defendant, if all the elements of a crime are established beyond a reasonable doubt. Commonwealth v. Mack, 850 A.2d 690, 693 (Pa.Super. 2004), citing Commonwealth v. Davis, 650 A.2d 452, 455 (Pa.Super. 1994), app. granted, 659 A.2d 557, affirmed, 674 A.2d 214 (Pa. 1996). The Commonwealth presented two witnesses and the Defendant presented four witnesses.

Findings of Fact:

Officer David Wardle testified at trial that he had been a patrol officer with Caln Township Police Department for over eleven years. (N.T., 8/5/13, p. 38). Prior to Caln Township he served in three other police departments. Id. Overall, he had served over fifteen years as a police officer. Id.

Office Wardle testified that on January 1, 2013, at approximately 5:20 AM, he was driving in an unmarked patrol vehicle northbound on Municipal Drive in Caln Township, Chester County. (N.T., 8/5/13, pgs. 39, 71 and 76). His vehicle was the only one on Municipal Drive at the time. (N.T., 8/5/13, p. 70). He stopped at the four way stop sign at the intersection of G.O. Carlson Boulevard. (N.T., 8/5/13, pgs. 39, 71 and 76). Out of habit, he had his vehicle window cracked open. (N.T., 8/5/13, pgs. 39 and 70). While stopped, he heard a vehicle coming toward the intersection at a high rate of speed; it was going eastbound on G.O. Carlson Boulevard. (N.T., 8/5/13, pgs. 39-40 and 71-72).

4

Specifically, he heard the sounds of the engine and the wheels on the road, which sounded like they were going fast. (N.T., 8/5/13, p.40). Office Wardle testified that he stayed stopped because he did not want to go through the intersection. Id. He observed the headlights coming and they appeared to be coming at a high rate of speed. Id. The officer did not think the vehicle would stop. Id. At the last second, the driver[2] applied the brakes and the vehicle came to a screeching halt, "as much as antilock brakes can come to a screeching halt." Id. He heard the wheels chirping as the brakes clicked on and off. Id.

The officer testified that the vehicle did stop but that it was partially past the stop sign and into the intersection. (N.T., 8/5/13, pgs. 40 and 73). He used Exhibits C-1 and C-2 as visual aids to demonstrate the roadways, the directions of travel and locations of his vehicle and Defendant's vehicle. (N.T., 8/5/13, pgs. 41-45). When Defendant's vehicle came to a stop, most of the vehicle had crossed over the stop line. (N.T., 8/5/13, pgs. 45 and 73).

Office Wardle initiated his emergency red and blue lights, put his window down the rest of the way and turned left onto G.O. Carlson Boulevard to pull up right next to Defendant's vehicle. (N.T., 8/5/13, pgs. 45 and 77-78). The officer testified that he put his hand out the window in an open manner and motioned for Defendant to stop. (N.T., 8/5/13, pgs. 45-46 and 78). He wanted to get Defendant's attention to stop and talk to him. (N.T., 8/5/13, p.45). He demonstrated in court how he signaled to Defendant, with his left hand, the universal sign for stop. (N.T., 8/5/13, p.46).

---

[2] Officer Wardle identified Defendant as the driver of the vehicle. (N.T., 8/5/13, pgs. 53-54).

5

Defendant failed to stop and accelerated eastbound at a high rate of speed. (N.T., 8/5/13, pgs. 46 and 78). Officer Wardle kept his emergency lights on, made a three-point turn to start following Defendant and activated his siren as well. (N.T., 8/5/13, pgs. 46-48). The officer followed Defendant into the Thornridge development where Defendant stopped his vehicle and got out. (N.T., 8/5/13, pgs. 48, 54, 78 and 80). Officer Wardle stopped his patrol car behind Defendant's vehicle. (N.T., 8/5/13, p. 48).

Defendant had exited his vehicle and the officer instructed him to get back in the car. (N.T., 8/5/13, pgs. 48 and 52-53). Defendant failed to comply. (N.T., 8/5/13, p.53). Defendant stated that he did not see the police vehicle at the stop sign. (N.T., 8/5/13, p. 188). Office Wardle observed that Defendant was unsteady on his feet when standing, swaying from side to side, almost staggering. (N.T., 8/5/13, pgs. 53-54 and 81). Defendant was not falling over, but the officer testified that he had to assist him a couple of times during the encounter. (N.T., 8/5/13, pgs. 54 and 81). The officer could smell a strong odor of alcoholic beverage coming from Defendant. (N.T., 8/5/13, pgs. 53-54).

Officer Wardle described the training and experience he had received with regard to interacting with people that may be under the influence of alcohol. (N.T., 8/5/13, p. 55). He had training at the police academy for one year, including training in DUI detection, field testing and how to properly stop a vehicle. (N.T., 8/5/13, pgs. 55 and 69-70). Officer Wardle takes updated mandatory training once a year. (N.T., 8/5/13, p. 69).

6

He had personally investigated about 75 DUI cases and had assisted numerous officers with their cases and field tests. (N.T., 8/5/13, p. 55). Also, during his 15 years as a police officer, he very frequently dealt with people who were under the influence of alcohol in non-DUI related settings. Id. In his personal life, he has frequently had the opportunity to come into contact with people who are under the influence of alcohol. Id.

Based on his training and experience, when he does a traffic stop Officer Wardle looks at the following for indicia of someone being under the influence of alcohol: "… physical observations, how they move, how they talk, the look in their eyes, the things that they say, the manner of their speech, whether it's slurred or clear." (N.T., 8/5/13, pgs. 55-56).

Officer Wardle testified that Defendant told him that he had a few drinks at a friend's house earlier and that he was trying to go home. (N.T., 8/5/13, p.56). The officer further testified that Defendant then asked him "… numerous times if I knew who he was. He asked me numerous times, also, if we had reached the point in life that we were all losing. And then, again, he was going to be the next President of the United States. And he asked me if I would like him to have Obama call to verify it." Id. Defendant started making the statements almost immediately when the officer started interacting with him, well before he was placed under arrest for DUI. (N.T., 8/5/13, p. 188).

Their encounter lasted a little over a half an hour and during that time, Defendant asked the officer five or six times if he knew who Defendant was and that he would be the next President of the United States. (N.T., 8/5/13, pgs. 56-57 and 188). Defendant

7

also told him five or six times that he would have President Obama give the officer a call. (N.T., 8/5/13, p.57).

Based on Officer Wardle's life experience he would not describe Defendant as saying it in a joking or sarcastic manner. (N.T., 8/5/13, p. 188). It sounded like drunken rambling to the officer. Id. Based on his training and experience, the officer formed the opinion that Defendant was under the influence of alcohol and/or drugs and that giving field sobriety tests would be appropriate. (N.T., 8/5/13, pgs. 57 and 82). This opinion was based upon Defendant's unsteady gait, his swaying side to side; his cryptic questions; the things he was saying, his slurred speech and the odor of alcohol. (N.T., 8/5/13, p.57).

Officer Wardle testified that that he generally uses three field sobriety tests and he gave Defendant the three tests during the incident in question. (N.T., 8/5/13, pgs. 58 and 83). First, he asked Defendant to say the alphabet and Defendant recited it fine. Id. Next, the officer used two physical tests to determine Defendant's ability to hold his balance and follow instructions. (N.T., 8/5/13, p. 58).

For the one leg stand test, Officer Wardle testified that he instructs suspects to stand with their feet together, hands at their side so that they can focus on what he is telling them. Id. Officer Wardle holds that position as well. Id. He stated, "[T]he instruction is to lift whichever foot you choose six inches off the ground, then count to 30 by thousands, one, 1,000; two, 1,000. And I do explain, not all the way to 30, but I will count and say to three or four, just so they understand the test." Id. He also asks if there is anything wrong with the suspect's legs, knees or hips that might prohibit doing the physical test. (N.T., 8/5/13, pgs. 59-60). Officer Wardle demonstrated for the jury

8

how he instructed Defendant to do the test. Id. He testified that Defendant said he was fine in response to the question about any leg, knee or hip issues. (N.T., 8/5/13, p. 60).

The officer stated that ideal road conditions for field sobriety tests, would be a flat surface with no obstructions or gravel. (N.T., 8/5/13, pgs. 58-59). During the incident in question, Defendant and Officer Wardle were on a good, flat, level, dry surface. (N.T., 8/5/13, p. 59).

When asked how Defendant performed on the test, the officer responded, "[a]t the count of three, he had to put his foot down for balance. He started over at the count of four. He had to put his foot down for balance again." (N.T., 8/5/13, pgs. 60 and 83). At that point, Defendant asked the officer if he could perform another test. (N.T., 8/5/13, p. 60).

Officer Wardle explained the walk and turn test to Defendant. Id. He demonstrated and described the test to the jury as he had described it to Defendant on the morning in question. (N.T., 8/5/13, pgs. 60-61). Specifically, the officer stated, "I, again, would have them hold position, in a mirror position. Have them put their right foot in front. I mirror the left foot in front of the right foot so there is no confusion, keep hands at side while I explain the test. He is to walk heel to toe nine steps, counting out with each step, turn, come back nine heel to toe steps. I will generally demonstrate how to do it appropriately." (N.T., 8/5/13, p. 61).

The officer testified that he did not recall if he demonstrated all nine steps for Defendant, it might have been five or six, but he did demonstrate the steps and the turn for him. Id. He demonstrated for the jury how he showed Defendant how to make the

9

turn, as a "pivot where you are, nothing extravagant," before taking the heel to toe steps back. Id. Regarding Defendant's performance of the test, Officer Wardle stated that Defendant was able to put one foot in front of the other, but used his arms out at the side for balance. Id.

The purpose of field sobriety tests is to help the officer determine whether someone is under the influence of alcohol. (N.T., 8/5/13, p. 62). To make that determination, the officer looks for "how they pay attention to the instructions, how they perform. Also, with the counting, it helps to see what their mental facilities are. Are they counting in order? Are they hesitating, thinking about what the next number is? And, then also, their balance, how well they carry themselves." Id.

Based upon his training and experience, the officer determined that Defendant failed the one legged stand test. Id. This opinion was formed because Defendant was only able to go to three or four steps before putting his foot down for balance. (N.T., 8/5/13, pgs. 62-63). Officer Wardle also determined that Defendant failed the walk and turn test because he did not follow instructions and he used his arms outstretched for balance. (N.T., 8/5/13, p. 63).

At this point during their interaction, the officer had formed the opinion that Defendant was under the influence of alcohol and incapable of safe driving. Id. He based this opinion on the totality of the circumstances, including the following: his observation of Defendant rolling through the stop sign, the high rate of speed, applying the brakes heavily at the last second, not following the officer's instruction to get back in the car, Defendant's unsteady manner, the swaying, slurred speech, the odor of alcoholic beverage, his questions to the officer of "have we reached a point where we're

10

all losing? Do I know who he is, that he is going to be the next president" and the field sobriety testing results. (N.T., 8/5/13, pgs. 63-64 and 88).

At some point during the officer's interactions with Defendant, he called Officer Pohlig to assist at the scene. (N.T., 8/5/13, p. 64). Officer Wardle placed Defendant under arrest, put him in the back of the patrol car and told Defendant that they were going to go to Brandywine Hospital for a chemical test of his blood. (N.T., 8/5/13, pgs. 64 and 84). The procedure for a chemical test entails a phlebotomist drawing two tubes of blood that will get sent to the State Police lab where an analysis will be done to determine the blood alcohol content. (N.T., 8/5/13, p. 64).

Prior to leaving the scene, Officer Wardle asked Defendant if he would submit to the blood test. (N.T., 8/5/13, p. 189). Defendant responded that he would not submit to the test because he had a couple of prior DUIs and Defendant did not mention that he had a skin rash or medical condition as the reason to not submit to the test.[3] (N.T., 8/5/13, pgs. 189-191). Defendant did not mention a fear or concern of needles to the officer, nor did Defendant ask for another form of testing for alcohol. (N.T., 8/5/13, p. 190).

Once at the hospital, but prior to the blood draw, the officer is required by law to read the Implied Consent Form to all people that are requested to submit to a chemical test. (N.T., 8/5/13, pgs. 64-65). The Implied Consent form is Form DL 26 issued by PennDOT. (N.T., 8/5/13, p. 65, Exhibit C-3). Officer Wardle read the DL 26 form to Defendant as follows:

---

[3] The court gave a cautionary instruction to the jury about Defendant's statement to the officer. The court instructed the jury that the evidence can only be considered in assessing the credibility of the witness and it is not to be used as evidence of his guilt or innocence of the crimes charged in this case. (N.T., 8/5/13, pgs. 189-190).

11

It is my duty as a police officer to inform you that of the following: You are under arrest for driving under the influence of alcohol or controlled substance in violation of Section 3802 of the Vehicle Code.

I am requesting that you submit to chemical test of blood.[4]

If you refuse to submit to the chemical test, your operating privileges will be suspended for at least 12 months. If you previously refused a chemical test, or previously were convicted of driving under the influence, you will be suspended for up to 18 months.

In addition, if you refuse to submit to the chemical test, and you are convicted of violating Section 3802(a)(1), relating to impaired driving of the Vehicle Code, and because of your refusal, you will be subject to more severe penalty set forth in Section 3804(c) relating to penalties of the Vehicle Code.

These are the same penalties that would be imposed if you were convicted of driving with a high rate of alcohol, which included a minimum of 72 consecutive hours in jail and minimum fine of $1,000, up to maximum five years in jail and maximum fine of $10,000.

You have no right to speak with an attorney or anyone else before deciding whether to submit to testing. If you request to speak with an attorney or anyone else after being provided these warnings, or you remain silent when asked to submit to chemical testing, you will refused (sic) the test resulting in the suspension of your operating privilege and other enhanced criminal sanctions if you are convicted of violating Section 3802(a) of the Vehicle Code.

(N.T., 8/5/13, pgs. 65-68, 85 and Exhibit C-3).

After the officer finished reading this to him, Defendant refused to submit to the testing. (N.T., 8/5/13, pgs. 68 and 85). Defendant essentially said, "no." (N.T., 8/5/13, pgs. 68 and 191). Officer Wardle asked him to submit to the chemical testing of blood twice, once at the scene of the stop and once at the hospital. (N.T., 8/5/13, pgs. 68, 84 and 191). After Defendant refused to give a sample, the officer took him home. (N.T., 8/5/13, p. 68).

---

[4] At trial, Officer Wardle explained to the jury that the DL26 form has a blank line in which they handwrite the substance which they are requesting to test. In this case the substance was blood. (N.T., 8/5/13, p. 66 and Exhibit C-3).

Officer Timothy Patrick Pohlig testified that he has been a police officer with Caln Township Police Department since 1999. (N.T., 8/5/13, p. 89). He has completed numerous trainings with the Pennsylvania State Police on identifying people under the influence and standardized field sobriety tests. (N.T., 8/5/13, pgs. 91-92). Within the training, test subjects would consume different amounts of alcohol so that they could view various levels of sobriety and intoxication. (N.T., 8/5/13, p. 92).

Officer Pohlig testified that some indicia of being under the influence that they are trained to look for in people include slurred speech, unsteady gait and odor of alcohol. Id. At the time of trial he had made almost a hundred DUI arrests throughout his 15 year career as an officer. (N.T., 8/5/13, p. 91). He also had a lot of interactions with people who were under the influence, but not in a DUI setting. (N.T., 8/5/13, p. 92).

He was on duty on January 1, 2013 when he was asked to assist Officer Wardle with the traffic stop on Thornridge Drive. (N.T., 8/5/13, pgs. 89-90). Officer Pohlig observed that Defendant had a staggering gait, he stumbled a bit when he walked, his speech was slurred and he appeared to be under the influence of some sort of substance. (N.T., 8/5/13, pgs. 90-91 and 93). The officer did not get close enough to Defendant to smell any alcohol because he was there to assist and needed to keep a reactionary distance away from him. (N.T., 8/5/13, p. 93).

Defendant tried to engage Officer Pohlig in conversation, but the officer did not respond. (N.T., 8/5/13, pgs. 93 and 95-96). Defendant was rambling about being the next president and saying "mumbo jumbo." (N.T., 8/5/13, p. 94). Defendant's speech was slurred and very incoherent. Id. "It just didn't make any sense." Id.

13

Iryian Chaudhry, a friend of Defendant for a couple of years, testified that he and Defendant went to a New Year's Eve party on December 31, 2012 at a restaurant Defendant's other friend owns.. (N.T., 8/5/13, pgs. 109-110). Defendant picked up Mr. Chaudhry and drove him to the restaurant. Id. They arrived at about 10:00 P.M. (N.T., 8/5/13, p. 111). Defendant introduced him to some people, they ate some food and then had a drink. Id.

Mr. Chaudhry further testified that Defendant owns an entertainment business and was comfortable getting on the microphone to engage the crowd. (N.T., 8/5/13, pgs. 109, 111-112). He testified that Defendant had an alcoholic mixed drink with orange juice and drank champagne for the midnight toast. (N.T., 8/5/13, pgs. 112-114). They left the restaurant between midnight and 1:00 A.M. (N.T., 8/5/13, p. 113).

Mr. Chaudhry was not sure if Defendant was able to safely drive; the restaurant owner asked him to drive Defendant, so Mr. Chaudhry drove Defendant's car when they left. (N.T., 8/5/13, pgs. 113-115). He knows that Defendant talks a lot when he has had too much to drink and is incapable to safely driving. (N.T., 8/5/13, pgs. 114-116).

They first went to Mr. Chaudhry's house so that his sister could follow them to Defendant's house. (N.T., 8/5/13, p. 113). That way Mr. Chaudhry would have a ride home from Defendant's house in the Thornridge development. (N.T., 8/5/13, pgs. 113 and 115). They arrived at Defendant's house between 1:00 A.M. and 1:30 A.M. (N.T., 8/5/13, p. 115).

Ruchi Kumar also testified as follows. Defendant is her younger brother and they live together on Thornridge Drive. (N.T., 8/5/13, pgs. 117-118). Her family was having a get-together at the house on the night in question (New Year's Eve), but they

14

did not serve alcohol. (N.T., 8/5/13, pgs. 118-119). Defendant left the house about 10:00 P.M. and returned about 1:00 A.M. (N.T., 8/5/13, p. 119). Upon his return, Defendant appeared normal and not under the influence of alcohol. Id.

Ms. Kumar stated that she was with Defendant until about 4:00 A.M. or 4:30 A.M. because they were watching their dog and puppies. (N.T., 8/5/13, pgs. 120-121). Defendant did not have anything to drink during that time because they do not have alcohol in the house. Id. Thereafter, she went to sleep and did not see what Defendant did after 4:30 A.M. (N.T., 8/5/13, p. 122).

Anne Goswamy testified as follows. Defendant is her youngest brother. (N.T., 8/5/13, p. 123). On December 31, 2012 into January 1, 2013, she was at Defendant's house, where her father also resides. (N.T., 8/5/13, pgs. 123-124). When she arrived about 7:00 P.M., Defendant was there and appeared fine and not under the influence of alcohol. (N.T., 8/5/13, pgs. 124-125). There is no alcohol in the house. (N.T., 8/5/13, pgs. 125 and 127-128). Ms. Goswamy stated that her dad does not drink and would not like it if any of his children drank. (N.T., 8/5/13, p. 128).

She stated that Defendant left the house and returned about 1:00 A.M. (N.T., 8/5/13, p. 125). Defendant appeared fine and not under the influence at that time. Id. Ms. Goswamy was leaving when Defendant returned so they only said hello and had brief contact. (N.T., 8/5/13, pgs. 125-126). She did not see him swaying or slurring his words. (N.T., 8/5/13, p. 126). She asked him how he got home and Defendant told her that a friend dropped him off. (N.T., 8/5/13, pgs. 127-128). Ms. Goswamy did not see Defendant between 1:30 A.M. and 5:30 A.M. (N.T., 8/5/13, p. 128).

15

Defendant testified as follows. He said he was not driving under the influence of drugs or alcohol on January 1, 2013. (N.T., 8/5/13, pgs. 130 and 169). He is a thirty-five year old entertainer and IT director. Id. He holds multiple certifications in technology, software development and LifeCycle. (N.T., 8/5/13, p. 131).

Regarding December 31, 2012, Defendant said he was home until 9:00 P.M. (N.T., 8/5/13, p. 132). He left to pick up Mr. Chaudhry and drove to Chateau Granieri, which is a banquet facility owned by his very good friend. (N.T., 8/5/13, pgs. 132 and 170). Defendant testified that he did not have any alcoholic beverages at his house, Mr. Chaudhry 's house or while driving to Chateau Granieri that night. (N.T., 8/5/13, pgs. 132-133).

While at the venue, Defendant stated that he hung out and socially networked with the entire clientele base. (N.T., 8/5/13, pgs. 132-133 and 171). He admitted to having a drink at about 10:30 P.M., which he got from the bar with Mr. Chaudhry. (N.T., 8/5/13, p. 134). He had a screwdriver, a Captain and Coke and a champagne toast at midnight. (N.T., 8/5/13, pgs. 134-135). He was an MC for about a half hour, during which he was talking loudly and chatting up the crowd. Id.

At about 12:30, Defendant and Mr. Chaudhry left the venue because Defendant had finished up his toasting duties and he wasn't feeling well. (N.T., 8/5/13, pgs. 135-136). When asked to describe how he was feeling, Defendant stated, "Just wasn't feeling well. I was kind of a little nauseous, exerted a lot of energy. Sometimes when you scream that loud behind the microphone, it kind of hits your stomach. So I just wasn't feeling well, kind of like cold sweats." (N.T., 8/5/13, pgs. 137-138). Defendant also testified that the owner of the venue, Venkat Reddy, "likes to bust my chops a little

16

bit. So he pretty much looked at Iryian and said, don't let him drive." (N.T., 8/5/13, pgs. 136-137 and 172-173). Mr. Chaudhry drove Defendant's car home. (N.T., 8/5/13, pgs. 172-173).

Defendant testified he did not have any further alcoholic beverages because he was not feeling well and just wanted to hang out. (N.T., 8/5/13, pgs. 138 and 174). Once home, he watched his dog and puppies. Id. He left his residence at 5:00 A.M. to go to WaWa for Tylenol, water and a pack of cigarettes. (N.T., 8/5/13, pgs. 139 and 174). The WaWa is a mile to a mile and a half from his house. (N.T., 8/5/13, p. 140).

On his way back home, Defendant claimed he was driving down G.O. Carlson Boulevard approaching Municipal Drive doing the normal speed limit, about 35 or 37 miles an hour. (N.T., 8/5/13, pgs. 140-141). He was aware that there was a stop sign at the intersection. (N.T., 8/5/13, p. 140). He testified that he stopped behind the stop sign without applying his breaks in a hard manner. (N.T., 8/5/13, p. 141).

He did not see a vehicle to the right side of his vehicle. Id. Defendant testified that he saw a clear intersection without any vehicles. (N.T., 8/5/13, p. 142). After the intersection, he was traveling east and saw police strobe lights turn on from the police station parking lot. (N.T., 8/5/13, pgs. 141-142 and 144). He didn't think much about it because he thought they may be going out on a call, so he continued to travel normally at about 35 or 37 mph. (N.T., 8/5/13, p. 145).

Defendant testified that he continued to travel on G.O. Carlson Boulevard until he made a left turn into the Thornbridge Development. Id. He then noticed the police lights and pulled over. (N.T., 8/5/13, p. 146). He exited his car because Officer Wardle pulled up behind him even though he knew that the standard procedure when your

17

vehicle is stopped by police that you are to not exit the vehicle. (N.T., 8/5/13, pgs. 148 and 177). Defendant asked the officer if everything was okay. (N.T., 8/5/13, p. 148). Defendant admitted to the officer that he had two drinks at a friend's place, the mixed drink and champagne. (N.T., 8/5/13, pgs. 148-149). Defendant stated that he tried to say something to Officer Pohlig because he has run into him on multiple occasions in the neighborhood. (N.T., 8/5/13, p. 149). He said, "I run into a lot of the guys, a lot of them pretty much on a regular basis, the local stores and whatnot." Id.

Defendant admitted to telling Officer Wardle a few times that he was running for President of the United States. (N.T., 8/5/13, pgs. 162 and 164). When asked why he did it, Defendant responded as follows: "At that point I was pretty charged. I could have told him I was a spawn of satan. It would have been okay because it wouldn't have really made any difference. It was more of a sarcastic remark, rather than me just kind of randomly going off on a tangent. Multiple requests onto the entire situation of the night, nothing was really said. My word meant absolutely nothing." (N.T., 8/5/13, pgs. 162-163). Defendant said he was frustrated. (N.T., 8/5/13, p. 164). Defendant also admitted that he told the officer several times that he could call President Obama to explain the situation. (N.T., 8/5/13, pgs. 165 and 177-181).

Defendant testified that after the officer informed him that he was going to take him for blood work, he told the officer that he "cannot go underneath the needle" because he was battling a skin disorder with a rash. (N.T., 8/5/13, pgs. 165-166 and 181-182). Photos Defendant had taken of his rash on January 4, 2013 were admitted into evidence. (N.T., 8/5/13, pgs. 166 and 167). He said they reflected what his body looked like on January 1, 2013. (N.T., 8/5/13, p. 167).

When asked why he was afraid to go under the needle, Defendant replied, "Further infections. My mother passed away from an infected needle from a dialysis center by getting blood MRSA when she had very similar rashes on her body. And she was diabetic. So I wasn't sure what these were at the time." (N.T., 8/5/13, p. 168). Defendant acknowledged that Officer Wardle read him the Implied Consent Form at the hospital and admitted that he refused to do the blood test. (N.T., 8/5/13, pgs. 169, 181 and 186).

Defendant stated he was very concerned about getting a driving under the influence charge. (N.T., 8/5/13, p. 184). He is a permanent resident and a DUI conviction would affect his residency status. (N.T., 8/5/13, p. 185). Even though he knew that the only way he could prove that he was not under the influence was by giving a sample of his blood, he was not willing to submit to the test. Id.

Discussion:

The crime of driving under the influence is set forth in 75 Pa.C.S.A. § 3802. It states that "An individual may not drive, operate or be in actual physical control of the movement of a vehicle after imbibing a sufficient amount of alcohol such that the individual is rendered incapable of safely driving, operating or being in actual physical control of the movement of the vehicle." 75 Pa.C.S.A. § 3802(a)(1).

Pennsylvania courts have held that "'Subsection 3802(a)(1) is an 'at the time of driving' offense, requiring that the Commonwealth prove the following elements: the accused was driving, operating, or in actual physical control of the movement of a vehicle during the time when he or she was rendered incapable of safely doing so due

19

to the consumption of alcohol.'" Commonwealth v. Teems, 74 A.3d 142, 145 (Pa.Super. 2013), quoting Commonwealth v. Segida, 985 A.2d 871, 879 (Pa. 2009).

With respect to the type, quantum, and quality of evidence required to prove a general impairment violation under Section 3802(a)(1), the Pennsylvania Supreme Court in Segida set forth the following:

> Section 3802(a)(1), like its predecessor [statute], is a general provision and provides no specific restraint upon the Commonwealth in the manner in which it may prove that an accused operated a vehicle under the influence of alcohol to a degree which rendered him incapable of safe driving.... The types of evidence that the Commonwealth may proffer in a subsection 3802(a)(1) prosecution include but are not limited to, the following: the offender's actions and behavior, including manner of driving and ability to pass field sobriety tests; demeanor, including toward the investigating officer; physical appearance, particularly bloodshot eyes and other physical signs of intoxication; odor of alcohol, and slurred speech. Blood alcohol level may be added to this list, although it is not necessary and the two hour time limit for measuring blood alcohol level does not apply. Blood alcohol level is admissible in a subsection 3801(a)(1) case only insofar as it is relevant to and probative of the accused's ability to drive safely at the time he or she was driving. The weight to be assigned these various types of evidence presents a question for the fact-finder, who may rely on his or her experience, common sense, and/or expert testimony. Regardless of the type of evidence that the Commonwealth proffers to support its case, the focus of subsection 3802(a)(1) remains on the inability of the individual to drive safely due to consumption of alcohol-not on a particular blood alcohol level.

Teems, 74 A.3d at 145, quoting Segida, 985 A.2d at 879.

Examining the evidence in the record, viewed in the light most favorable to the Commonwealth as verdict winner, it is abundantly clear that there was sufficient evidence to support the jury's finding that Defendant was guilty of driving under the influence of alcohol. Each element of the crime was established beyond a reasonable doubt.

20

Defendant's actions and behavior, including manner of driving and failing to pass field sobriety tests; his demeanor at the scene; his unsolicited comments and his physical appearance establish that he was under the influence and incapable of safe driving. Specifically, his driving at a high rate of speed, applying the brakes heavily at the last second, rolling through the stop sign, failing to acknowledge the officer's motions to stop, not following the officer's instruction to get back in the car, unsteady manner, swaying, slurred speech, the odor of alcoholic beverage, his bizarre questions and statements to the officer and the failed field sobriety tests establish that Defendant was driving a vehicle when he was incapable of safely doing so due to the consumption of alcohol.

It is abundantly clear that the jury rejected Defendant's version of the events and found the other witnesses to be credible. As set forth above, the fact-finder is free to believe all, part or none of the evidence presented. The jury's determination that Defendant was guilty of driving under the influence was supported by sufficient evidence and Defendant's argument on appeal is without merit.

## Weight of the Evidence:

"A motion for new trial on the grounds that the verdict is contrary to the weight of the evidence, concedes that there is sufficient evidence to sustain the verdict." Commonwealth v. Widmer, 744 A.2d 745, 751 (Pa. 2000), citing Commonwealth v. Whiteman, 485 A.2d 459 (Pa.Super. 1984). "Thus, the trial court is under no obligation to view the evidence in the light most favorable to the verdict winner." Widmer, 744 A.2d at 751, citing Tibbs v. Florida, 457 U.S. 31, 38, 102 S.Ct. 2211 (1982), n. 11, 102 S.Ct. 2211. An allegation that the verdict is against the weight of the evidence is

21

addressed by and at the discretion of the trial court. Widmer, 744 A.2d at 751-752, citing Commonwealth v. Brown, 648 A.2d 1177 (Pa. 1994).

A new trial should not be granted due to a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. Widmer, 744 A.2d at 752, citing Thompson v. City of Philadelphia, 493 A.2d 669, 673 (Pa. 1985). "A trial judge must do more than reassess the credibility of the witnesses and allege that he would not have assented to the verdict if he were a juror. Trial judges, in reviewing a claim that the verdict is against the weight of the evidence do not sit as the thirteenth juror. Rather, the role of the trial judge is to determine that 'notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.'" Id.

"'[A] new trial should be awarded when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail.'" Commonwealth v. Sullivan, 820 A.2d 795, 806 (Pa.Super. 2003), app. denied, 833 A.2d 143 (Pa. 2003), quoting Commonwealth v. Goodwine, 692 A.2d 233, 236 (Pa.Super. 1997), app. denied, 700 A.2d 438 (Pa. 1997). Stated another way, the evidence must be "so tenuous, vague and uncertain that the verdict shocks the conscience of the court.'" Sullivan, 820 A.2d at 806, quoting Commonwealth v. La, 640 A.2d 1336, 1351 (Pa.Super. 1994), app. denied, 655 A.2d 986 (Pa. 1994).

In addition, the Pennsylvania Supreme Court has been clear that "'appellate review of a weight claim is a review of the exercise of discretion, not of the underlying

22

question of whether the verdict is against the weight of the evidence.'" Sullivan, 820 A.2d at 806, quoting Widmer, 744 A.2d at 751-752.

Accordingly, this court applied the above standard when reviewing the evidence presented at trial. Since in this claim, Defendant conceded that there was sufficient evidence to support each material element of driving under the influence, we examined the testimony of the witnesses and evidence presented to determine if the evidence was so tenuous, vague and uncertain that the verdict shocks the conscience of the court.

The Pennsylvania Supreme Court has clearly said that "it is the trial court's sense of justice that must be shocked before a new trial may be granted on a claim that the verdict was against the weight of the evidence." Sullivan, 820 A.2d at 807, n. 11, citing, Brown, 648 A.2d at 1191 (Pa. 1994). After review of the evidence, this court unequivocally determines that the guilty verdict of driving under the influence is not against the weight of the evidence. To the contrary, the evidence strongly supports the verdict. The jury's verdict on this charge is not contrary to the evidence as to shock one's sense of justice. For the above listed reasons, Defendant is not entitled to a new trial. Accordingly, this issue on appeal is without merit.

BY THE COURT:

PHYLLIS R. STREITEL,     J.

DATE: 3/9/16

Certified From The Record

This ___11___ Day of _____ 20__

_____
Deputy Clerk of Common Pleas Court

23